Christopher MARCOUX–NORTON

v.

**KMART CORPORATION.**

Civ. A. No. 5:91–CV–308.

United States District Court, D. Vermont.

May 26, 1993.

Roger, Emanuel Kohn, Kohn & Rath, Hinesburg, VT, for Plaintiff.

Thomas H. Somers, Moon, Moss, McGill & Bachelder, P.A., Portland, ME, Richard Thomas Cassidy, Hoff, Curtis, Pacht, Cassidy & Frame, P.C., Burlington, VT, for Defendant.

## OPINION AND ORDER

BILLINGS, District Judge.

Plaintiff Christopher Marcoux–Norton brought suit against his former employer, Defendant Kmart Corporation ("Kmart"), claiming damages for wrongful discharge, intentional infliction of emotional distress, and breach of contract. Kmart moved for summary judgment. By leave of Magistrate Judge Jerome J. Niedermeier, Plaintiff amended his complaint to include counts for promissory estoppel, defamation, and tortious interference with contractual relations.

For the reasons set forth below,[1] Kmart's motion for summary judgment on Plaintiff's wrongful discharge, intentional infliction of emotional distress, contract, and promissory estoppel counts is granted, and is denied with respect to Plaintiff's defamation and interference with contract counts. Both Plaintiff's and Kmart's motion to strike are also denied, as is Kmart's motion for Rule 11 sanctions.

## BACKGROUND

For the purpose of deciding a motion for summary judgment, we view the allegations of the non-moving party (Plaintiff) as true, and therefore will discuss the facts of this case in the light most favorable to Plaintiff. Plaintiff worked for Kmart on three separate occasions spanning a time period of over four years. He originally worked at Kmart's South Burlington, Vermont store for over one and one-half years. He then worked for Kmart for nearly one year at its Denton, Texas store. From December 20, 1989 until his employment was terminated on June 20, 1991, Plaintiff once again worked at Kmart's

1. Honorable Albert W. Coffrin, Senior Judge of the United States District Court for the District of Vermont, presided over this case prior to his death in January 1993. Although the case was later transferred to Judge Franklin S. Billings Jr., Judge Coffrin was the principal author of this opinion.

South Burlington store. Plaintiff enjoyed his work at Kmart and hoped to make a career there. He was promoted a number of times and was manager of the Sporting Goods/Automotive Accessories Department ("Sports/ Auto Manager") at the time of his termination.

Plaintiff had difficulty working with his immediate supervisor, Store Manager Thomas Young. Young expressed dissatisfaction with Plaintiff's performance on a number of occasions and tended to show favoritism towards employees under Plaintiff's supervision. He also ordered two store employees to photograph work areas over which Plaintiff was responsible, in an effort to discover a hazard for which Plaintiff could be reprimanded or fired.

On at least one occasion Young, Personnel and Training Manager Gayle Messick, Loss Control Manager Tim Ryan, and Kmart employees Dave Evans and Francine Barbeau discussed Plaintiff in the break room at the South Burlington store. Young called Plaintiff a "son of a bitch," and Young and Messick discussed replacing Plaintiff with Dave Evans. Young stated that he would need some reason to fire Plaintiff.

Three days before Plaintiff was fired, Young became very upset with Plaintiff, yelled at him, and told him that he was no good as Sports/Auto Manager. He mentioned that Plaintiff might be good in another department of the store. While the circumstances surrounding this conversation were such that Plaintiff did not believe any response was appropriate at the time, he believed that Young was offering to transfer him to another position. Plaintiff's acceptance of any of the positions mentioned by Young would have constituted a demotion, but Plaintiff was willing to consider such an arrangement because the positions mentioned were not under the direct supervision of Young.

In May of 1991, Plaintiff and his fiancee Angela Erno, also a Kmart employee and now Plaintiff's wife, applied for a home loan with Vermont Federal Bank ("Federal"). As part of the application process, Plaintiff and his fiancee completed a "Request for Verification of Employment" form, which was mailed to Kmart for completion. The form contained questions concerning Plaintiff's salary and chances for continued employment. Gayle Messick, after consulting Thomas Young, entered "50–50 at this time" on the line marked "probability of continued employment" regarding Plaintiff's employment status. On Angela Erno's form, Messick stated "good" in response to the same question. While Messick filled out these forms regularly, District Manager John Meyer was the person who would ultimately determine whether Plaintiff would be fired, and therefore was the person best able to evaluate Plaintiff's chances of continued employment.

Federal rarely receives unfavorable responses to its inquiry concerning chances of continued employment and therefore phoned Kmart's South Burlington store to confirm that the information they had provided was correct. In two conversations with Federal, Messick and Young confirmed that "50–50" was the answer they intended to give the bank. Plaintiff's application was then denied based on the tenuousness of his prospects for continued employment.

Plaintiff received notification at work on June 19, 1991 that his loan was denied. He lost his composure, was crying, and decided to leave work. He handed over his keys to a subordinate, stated he was resigning his position, and walked to the front of the store. At the front of the store he encountered Thomas Young. Plaintiff told Young, "I resigned the position," and that he was very upset and had to leave. He began to walk away, but then turned around and told Young that he wasn't quitting, just resigning his position. By stating that he was resigning his position, Plaintiff believed he was accepting an offer by Young to take a demotion by transferring to another department of the store. Young said nothing when Plaintiff walked away. The next day, District Manager John Meyer informed Plaintiff that he was fired.

## DISCUSSION

### I. Jurisdiction

Jurisdiction is based on diversity of citizenship and an amount in controversy exceeding $50,000. 28 U.S.C. § 1332(a). Plaintiff is a

resident of Vermont. Kmart is a Michigan corporation authorized to do business in the State of Vermont. Plaintiff requests actual damages in the amount of $150,000, and additional punitive damages.

## II. Standard of Review

 This court will grant summary judgment when it determines that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). We must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988). A material fact is genuinely in dispute if a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If the non-moving party fails to make a showing sufficient to establish an essential element of its case on which it bears the burden of proof at trial, however, summary judgment will be granted to the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

## III. Motion for Summary Judgment

In this diversity suit, whether Kmart is entitled to judgment is a matter of law to be determined under the law of Vermont.

### A.1. *Wrongful Discharge*

 Plaintiff's first count alleges that Kmart wrongfully terminated him for accepting Kmart's offer of a demotion, and failed to follow company procedures and guidelines specifying the proper procedures and circumstances for the termination and discipline of employees. Kmart denies Plaintiff's allegations and asserts that Plaintiff was an at will employee, terminable at any time for any reason.. Plaintiff's claim that Kmart procedures were not properly followed will be covered in our discussion of Plaintiff's contract claim, where it more appropriately belongs. His claim that he was discharged for an improper reason is discussed immediately below.

 In Vermont, an employer may dismiss an employee at any time and for any reason, in the absence of an employment contract for a specific term, unless there is a clear and compelling public policy against the reason given for the discharge. *Burt v. Standard Register Co.,* No. 90–295, slip op. at 5 (D.Vt. June 19, 1992) (Coffrin, J.); *Jones v. Keogh,* 137 Vt. 562, 409 A.2d 581 (1979). In looking to the public policy of the state, a court is not limited to legislative pronouncements or judicial decisions. Public policy may be said to abide "in the customs and conventions of the people—in their clear consciousness and conviction of what is naturally and inherently just and right. . . ." *Payne v. Rozendaal,* 147 Vt. 488, 492, 520 A.2d 586 (1986) (quoting *Pittsburgh, Cincinnati, Chicago & St. Louis Ry. v. Kinney,* 95 Ohio St. 64, 68–69, 115 N.E. 505, 507 (1916)).

Plaintiff alleges he was terminated in response to his request for a demotion. (Amended Complaint ¶ 7.) Even assuming that Plaintiff's demotion request is the reason for his termination, and not the fact that he left Kmart's premises without obtaining permission, as Kmart asserts, we find that Plaintiff's termination violates no clear and compelling policy in Vermont. In *Payne, supra,* the Vermont Supreme Court found that termination solely on account of age violates a compelling public policy, particularly in light of national and local legislation prohibiting age discrimination. 147 Vt. at 494, 520 A.2d 586. In *Burt, supra,* this Court found plaintiff's termination because he had "blown the whistle" on his employer violative of a compelling public policy. *Burt,* No. 90–295, slip op. at 6.

While courts applying Vermont law have upheld the exercise of these public rights, the same courts have been reluctant to reprimand employers for terminating employees who exercised merely private rights. For example, the Vermont Supreme Court in *Jones v. Keogh,* 137 Vt. 562, 409 A.2d 581, refused to entertain the plaintiff's claim that she was wrongfully terminated for disputing her employer's vacation and sick leave policies. She had also alleged that her discharge was motivated by bad faith, malice, and was

in retaliation for exercise of her rights. The Court's·response to her claim was:

> While full employment and employer-employee harmony are noble goals to which society aspires, they alone do not present the clear and compelling public policies upon which courts have been willing to rely in upholding an action for discharge of an employee at will. Nor is the fact that bad faith, malice and retaliation are motives upon which we look askance sufficient to impel us to find a clear and compelling public policy where, as here, there is none.

*Jones*, 137 Vt. at 564, 409 A.2d 581; *see also Payne*, 147 Vt. at 494, 520 A.2d 586. We believe *Jones* controls the situation presented us by Plaintiff and find he states no claim for wrongful discharge.[2] Kmart's motion for summary judgment is granted on this count.

### A.2. *Intentional Infliction of Emotional Distress*

In his first count, Plaintiff also alleges that Kmart took three actions that were intended to cause him severe emotional distress. He first claims that Store Manager Thomas Young employed willfully abusive conduct toward him in an effort to cause him to be fired or quit. Plaintiff gives as an example the fact that Young requested two of his subordinates to take photographs of areas over which Plaintiff was in charge as Sports/Auto Manager, in an attempt to show Plaintiff was failing to address hazards that existed in these areas. Plaintiff also claims District Manager John Meyer acted recklessly in terminating Plaintiff without giving Plaintiff an

opportunity to explain his side of the situation, resulting in severe emotional distress to Plaintiff. Finally, Plaintiff alleges that he suffered severe emotional distress when Young, in stating that Plaintiff's chances of continued employment were 50–50, purposely caused Plaintiff to lose financing so·that he could not buy a home. The emotional distress he alleges he suffered includes crying at the time of the incident and occasional crying spells to the present date, being upset, being sick to his stomach, irritability, weight gain, insomnia, disappointment, and depression.[3]

 *Sheltra v. Smith*, 136 Vt. 472, 476, 392 A.2d 431 (1978) establishes the four elements necessary to state a case for intentional infliction of emotional distress ("IIED") in Vermont: (1) outrageous conduct; (2) done intentionally or with reckless disregard of the probability of causing emotional distress; (3) resulting in the suffering of extreme emotional distress; (4) actually or proximately caused by the outrageous conduct. While Vermont courts have held that the mere termination of employment will not support a claim for intentional infliction of emotional distress, grounds for such a claim may exist "if the manner of termination evinces circumstances of oppressive conduct and abuse of a position of authority vis-a-vis plaintiff...." *Crump v. P & C Food Markets, Inc.*, 154 Vt. 284, 296, 576 A.2d 441 (1990). We will examine each of Plaintiff's charges according to the four elements found in *Sheltra*.

---

**2.** In *Brower v. Holmes Transportation, Inc.*, 140 Vt. 114, 435 A.2d 952 (1981), *overruled on other grounds by Soucy v. Soucy Motors, Inc.*, 143 Vt. 615, 471 A.2d 224 (1983), the Vermont Supreme Court discussed a New Hampshire case, *Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549 (1974), as a case that relaxes the termination with or without cause rule so far as to allow it to be overcome by a showing of malice or bad faith. *Brower*, 140 Vt. at 117, 435 A.2d 952. The Vermont Supreme Court did not have occasion to entertain an expansion of Vermont law along these lines, finding that in the case before it, plaintiff had made no allegation of malice on the part of defendant. *Id.* The New Hampshire Supreme Court subsequently pulled back from its expansive holding in *Monge*, however, to limit a plaintiff's recovery to situations where an employee is discharged because he or she performed an act that public policy would encour-

age, such as accepting jury duty, or refused to do that which public policy would condemn. *Howard v. Dorr Woolen Co.*, 120 N.H. 295, 414 A.2d 1273, 1274 (1980). The *Howard* opinion seems more in line with rulings of the Vermont Supreme Court and we decline today to go beyond the Court's ruling in *Jones*.

**3.** Since we are granting Kmart's motion for summary judgment on Plaintiff's intentional infliction of emotional distress claim, it is unnecessary to address its motion to strike portions of the affidavits of Plaintiff and his mother, and the motion is therefore denied. Kmart's motion for Rule 11 sanctions is also denied. The court did not rely on the affidavits submitted by Kmart and objected to by Plaintiff, and we therefore also deny Plaintiff's motion to strike.

■ The first element a plaintiff must establish in an intentional infliction of emotional distress claim is conduct " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Demag v. American Ins. Cos.*, 146 Vt. 608, 611, 508 A.2d 697 (1986) (quoting Restatement (Second) of Torts § 46, Comment d (1965)). Demonstrating outrageous conduct is a heavy burden for a plaintiff to bear, and it is for the court initially to determine whether the conduct alleged is sufficiently outrageous to meet this test. *Saffron v. McQuillen*, 158 Vt. 322, 609 A.2d 990 (1992).

■ The first two actions Plaintiff claims caused him severe emotional distress fall far short of the outrageous conduct required to sustain an IIED claim. This Court has previously held that terminating an employee without giving him an opportunity to tell his side of the story does not constitute outrageous conduct. *See Moss v. Mutual of Omaha Ins. Co.*, No. 89–138, slip op. at 10, 1990 WL 485666 (D.Vt. April 9, 1990) (Billings, C.J.) (employee not given opportunity to respond to charges of sexual harassment). Similarly, the actions of Young that Plaintiff claims were intended to provoke him to quit his job do not demonstrate the level of outrageousness required to sustain an IIED claim. "The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Restatement (Second) of Torts § 46, Comment d (1965); *see also Ploof v. Brooks Drug, Inc.*, No. 89–270, slip op. at 13–14, 1991 WL 497170 (D.Vt. Aug. 28, 1991) (Coffrin, J.) (verbal abuse and threatening gestures by supervisor not enough to state IIED claim). The actions of Thomas Young, including ordering the taking of photographs, talking with employees under Plaintiff's supervision for long periods of time so that Plaintiff was without their assistance, and gathering with other employees to call Plaintiff a "son of a bitch" and discuss his termination, are precisely the type of trivial behavior that this Court has held does not state an IIED claim.

■ It is less clear that Plaintiff's allegation that Thomas Young acted to intentionally deprive Plaintiff of his home loan fails to meet the outrageousness requirement necessary for stating an IIED claim. As stated above, the Vermont Supreme Court in *Crump* indicated that it is more willing to entertain IIED claims where the plaintiff alleges oppressive behavior arising from a defendant employer's abuse of authority over plaintiff. *Crump*, 154 Vt. at 296, 576 A.2d 441. Plaintiff's claim regarding Young's response to Federal's inquiry about Plaintiff's employment prospects potentially states such a situation. In such a case, an employer is uniquely in a position to influence the disposition of an employee's application.[4] Such behavior must still meet the outrageousness requirement, however.

While no Vermont cases consider the type of situation presented to us today, an Iowa case, *Vinson v. Linn–Mar Community School Dist.*, 360 N.W.2d 108 (Iowa 1984), does address an employee's IIED claim in terms of the employer-employee relationship. In *Vinson*, the plaintiff, a school bus driver, was discharged from employment after a lengthy dispute with her employer concerning the proper procedure for recording the time necessary to drive her bus route. The court found that plaintiff's employer had taken a number of actions designed to upset her: they accused her of falsifying time records, knowing that she had not acted dishonestly; they discharged her on grounds of dishonesty; and they reported the dishonesty to plaintiff's prospective employer, knowing that the report would harm plaintiff's chances of receiving an employment offer from that employer, and knowing that plaintiff had not acted dishonestly. *Id.* at 119.

While the court stated that employers and employees have a special relationship and employers should refrain from abusive behavior toward their employees, it nevertheless held:

> Even though we believe a jury could find defendants engaged in a deliberate cam-

---

4. Of course Young's statement may well have reflected an accurate assessment of Plaintiff's chances for continued employment. The veraci-

ty and intent behind this statement are at issue in Plaintiff's defamation claim. *See* discussion at p. 779, *infra*.

paign to badger and harass plaintiff, we do not believe their conduct rises to the level of extremity essential to support a finding of outrageousness. The jury could find that defendants' actions were petty and wrong, even malicious, but we do not believe a trier of fact could reasonably conclude that the conduct went beyond all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community.

*Id.* Plaintiff's situation is much as that in the *Vinson* case. In both cases, the jury could well have found malicious behavior by defendant. In both cases, the plaintiff's relationship with a third party with whom he/she had hoped to deal with was potentially adversely impacted by defendant's spiteful behavior. Nevertheless, we find that the behavior alleged, as the Iowa Supreme Court also found, cannot be viewed as utterly atrocious and intolerable.[5] Defendant's motion for summary judgment on this count is therefore granted.[6]

### B. *Breach of Express or Implied Contract*

Count II of Plaintiff's complaint alleges that Kmart breached express or implied agreements with Plaintiff that it would only terminate him in accordance with established company procedures and guidelines, and that he would be treated fairly, and retain his employment with Kmart as long as he performed his work properly, and as long as there was work for him to do. Defendant asserts that Plaintiff had no contract with Kmart and that he was an at will employee and could be terminated at any time, with or without cause.

The general rule in Vermont is that "an employment contract for an indefi-

nite term is an 'at will' agreement, terminable at any time, for any reason or for none at all." *Sherman v. Rutland Hosp., Inc.,* 146 Vt. 204, 207, 500 A.2d 230 (1985). This is simply a rule of contract construction, however, and imposes no substantive limitation on the right of contracting parties to modify terms of their arrangement. *Foote v. Simmonds Precision Products Co.,* 158 Vt. 566, 613 A.2d 1277, 1279 (1992) (citing *Sherman,* 146 Vt. at 207, 500 A.2d 230). For example, a contract may not be considered terminable at will if the employer has foreclosed its right to terminate except for cause. This foreclosure may occur either by express language or clear implication. *Benoir v. Ethan Allen, Inc.,* 147 Vt. 268, 270, 514 A.2d 716, 718 (1986). In determining whether an implied-in-fact promise for continued employment exists, it is proper for a court to consider the personnel policies or practices of the employer, including any actions or communications that may constitute assurances of continued employment. *Ploof v. Brooks Drug, Inc.,* No. 89–270, slip op. at 4, 1991 WL 497170 (quoting *Pugh v. See's Candies, Inc.,* 116 Cal.App.3d 311, 327, 171 Cal.Rptr. 917, 925–6 (1981)).

Plaintiff claims that Kmart entered into an express or implied agreement with him that he would be treated fairly, and would remain employed by Kmart as long as there was work for him to do and as long as he performed his work properly. (Amended Complaint ¶ 14.) In support of his claim, Plaintiff stated in his affidavit:

> Over the course of the four years that I was employed in the Kmart organization, I was led to believe by various supervisors and managers and did believe that I would continue to be employed with Kmart as

**5.** We would distinguish this case and the *Vinson* case from *Crump,* in which the Vermont Supreme Court found plaintiff had stated an IIED claim, by emphasizing that *Crump* focussed on outrageous behavior in the manner in which the plaintiff was terminated. In *Crump,* plaintiff was required to sit at a lengthy meeting from which he did not feel free to leave, and at which he was not permitted a break for rest or food, was badgered into amending and signing a statement, and was summarily terminated after eighteen years of service to his employer. The emphasis in the case before us, however, is on emotional distress

resulting from defendant's disclosure to a third party, a situation more closely parallel to that found in *Vinson.* We have already disposed of Plaintiff's claim that Kmart acted outrageously in terminating him without a chance to explain his side of the story.

**6.** Given our disposition of this count, we do not address Kmart's claim that Plaintiff's IIED claim is preempted by Vermont's Workers' Compensation Act, 21 V.S.A. §§ 601–710 (1987).

long as there was work available (*i.e.,* Kmart did not close down the store in which I was working) and as long as I performed my work satisfactorily. I was also led to believe by my K mart supervisors and managers that I would be treated fairly.

(Pl.'s Affidavit ¶ 5.) This Court has previously held that "[s]uch vague assurances do not constitute negotiated contract terms[,]" and we hold so again today. *Moss v. Mutual of Omaha Ins. Co.,* No. 89–138, slip op. at 8, 1990 WL 485666; *see also Satink v. National Life Ins. Co.,* No. S–462–86WnC, slip op. at 5 (Vt.Wash.Super. Nov. 3, 1987) (Morse, J.) ("Where employment is contingent upon satisfactory performance, no test for reasonableness or good cause need be applied to an employer's action in discharging the employee: the employer is the sole judge of what is satisfactory."), *appeal dismissed* (per stipulation of parties) (Oct. 18, 1988).

█ Plaintiff also claims that Kmart failed to follow specified procedures and guidelines for the discipline and termination of its employees. Plaintiff has been unable to establish that there are any such procedures and guidelines and his contract claim on this issue must therefore fail.

A number of cases in Vermont hold that an employee may bargain with his or her employer to be bound by disciplinary procedures found in the personnel manual or employee handbook in the absence of an employment agreement for a fixed term. In *Sherman v. Rutland Hosp., Inc.,* 146 Vt. 204, 500 A.2d 230 (1985), for example, the Supreme Court held that, while it was possible that the employee manual itself created no enforceable rights regarding termination procedures, plaintiff had demonstrated that he and his employer had bargained for these terms and had agreed to make them part of the employee's employment agreement. *Id.* at 208–09, 500 A.2d 230. In contrast, the Vermont Supreme Court in *Larose v. Agway, Inc.,* 147 Vt. 1, 508 A.2d 1364 (1986) found that the policies in the defendant's personnel manual were not negotiated for by the employees and that the employer adopted, enforced, implemented and amended these procedures unilaterally. Plaintiff therefore did

not have an actionable claim for defendant's failure to follow any procedures found in the personnel manual. *Id.* at 3, 508 A.2d 1364.

Not only did Plaintiff here fail to bargain individually for any agreement regarding disciplinary procedures as part of Kmart policy, the record fails to show that Kmart maintained any such policy. Kmart's Employee Handbook, which Plaintiff read and signed, contains only a cursory discussion of disciplinary procedures and leaves the discretion for appropriate discipline to the General Store Manager. (Mem. in Supp. of Def.'s Mot. for Summ.J., Ex. 7 at 13.) Plaintiff alleges that other disciplinary guidelines are found in Kmart's store policy manual, but admits that he has never read them. He therefore could not have bargained to incorporate such a term into any sort of employment agreement. In general, his implied contract claim rests on oral statements made to him that certain actions were taken pursuant to company procedure. These are simply not enough to meet the requirements for a contract as recognized by the Vermont Supreme Court.

█ Plaintiff's final assertion regarding his contract claim is that Kmart breached an implied covenant to deal fairly and in good faith with him. He claims his termination was either the result of a conspiracy to make him quit or be fired, or because he attempted to resign his position as Sports/Auto Manager in favor of a lower position. Kmart asserts he was fired because he left work without obtaining the permission of his supervisor.

█ The Vermont Supreme Court has recognized that an implied covenant of good faith and fair dealing prevails in every contract in order to prevent the parties to the contract from injuring or destroying the rights of the other party. *Shaw v. E.I. Du Pont de Nemours & Co.,* 126 Vt. 206, 209, 226 A.2d 903 (1966). This Court has indicated, in dicta, that this covenant applies to employment contracts. *See, e.g., McHugh v. University of Vermont,* 758 F.Supp. 945, 953 (D.Vt.1991) (Parker, J.), *aff'd,* 966 F.2d 67 (2d Cir.1992).

Plaintiff does not receive the benefit of this covenant, however:

> In a pure at-will employment contract, where all the employee has bargained for is a relationship in which he or she can be terminated at any time, with or without cause, the implied covenant of good faith has little effect as there are few, if any, contractual benefits for the implied covenant of good faith to protect. Thus, barring a clear and compelling public policy against the discharge or a statutory exception to the at-will doctrine, no amount of bad faith, malice, and retaliatory motive on the part of the employer would afford relief to an aggrieved discharged at-will employee. *Jones*, 137 Vt. at 563–64 [409 A.2d 581].
>
> On the other hand, if the employer's motives for dismissing an employee are relevant either to the nature of, or the benefits received under, the contract the implied obligation of good faith comes into play.

*Burt*, slip op. at 10. Plaintiff has not demonstrated that he bargained for any contract terms, his discharge did not violate a compelling public policy or statutory prohibition, and the employer's motives for termination were not relevant to the nature of his contract even if Kmart's motives are as Plaintiff alleges.[7] Defendant's motion for summary judgment on Plaintiff's contract claim is therefore granted.

### C. *Promissory Estoppel*

In his third count, Plaintiff claims that Kmart made certain promises to him that he relied on to his detriment. He pleads promissory estoppel with respect to two of Kmart's actions. Plaintiff first asserts that he resigned his position as Sports/Auto Manager in reliance on Kmart employee Young's promise two days before Plaintiff's termination that he could transfer to another department in the store. Plaintiff further asserts that Kmart promised him that he would be treated fairly by Kmart and continue in the company's employ as long as he did his job properly and as long as there was work for him to do there. We find that Kmart made no such promises to Plaintiff and grant Kmart summary judgment on Plaintiff's promissory estoppel claim.

■ The Vermont Supreme Court recently recognized that promissory estoppel may be used affirmatively as an independent cause of action when the elements for such a claim are present. *Foote v. Simmonds Precision Products Co.*, 158 Vt. 566, 613 A.2d 1277 (1992). The elements of a promissory estoppel claim are found in the Restatement (Second) of Contracts § 90(1) (1981):

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

In *Foote*, Plaintiff asserted that his reliance on statements in his employer's employee handbook, to the effect that his use of grievance procedures set forth therein would not penalize him in any way led to his discharge after following the procedure to pursue his grievances. His employer claimed instead that he was discharged for falsifying his time records. At trial, the jury held for the plaintiff on his promissory estoppel claim.

---

7. In reaching the conclusion that Kmart's motives are not relevant to the nature of Plaintiff's contract, we refer to a situation such as that in *Ploof*, No. 89–270, in which we found that the employee's continued employment was contingent upon his satisfactory performance. In that case we found that plaintiff failed to establish a prima facie finding of bad faith on the part of his employer. *Id.* at 8. *See also Chandler v. Bombadier Capital, Inc.*, No. 90–64, slip op. at 15–17, 1992 WL 474798 (D.Vt. Sept. 10, 1992) (Niedermeier, Mag. J.) (Report and Recommendation) (whether plaintiff had a contract under which he could only be terminated for gross incompetence or defalcation was a question for the jury), *adopted*, No. 90–64 (D.Vt. Oct. 8, 1992) (Coffrin, J.). The case before us is more similar to *Moss*, No. 89–138, however, in that we find that the vague assurances made to Plaintiff that he would remain employed by Kmart as long as his performance was satisfactory, do not alter Plaintiff's status as a pure at-will employee, terminable at any time for any reason. This conclusion is buttressed by the fact that Plaintiff, in the course of his employment at Kmart over four years, signed nine statements that unambiguously stated he was an at-will employee.

The Vermont Supreme Court held that there was sufficient evidence in the record to support the jury verdict. The Court pointed out that defendant's employee handbook contained specific procedures regarding communication between employees and management and specifically promised, "'If you follow these steps, you cannot be criticized or penalized in any way.'" 158 Vt. at 573, 613 A.2d at 1281. The Court found that the maker of such a statement should expect it to induce reliance on the part of those reading it, and that the jury had obviously felt that way as well.

An employee manual also lies at the heart of another promissory estoppel employment claim decided by the Vermont Supreme Court. In *Larose v. Agway, Inc.*, 147 Vt. 1, 508 A.2d 1364 (1986) the Court refused to entertain plaintiff's promissory estoppel claim, stating:

> Nothing in plaintiff's complaint, or in plaintiff's affidavit submitted in opposition to the motion for summary judgment, or in the stipulation of the parties suggests that plaintiff was aware of, or relied upon, the provisions of the personnel manual in deciding to enter into or to remain in defendant's employment. In a word, a pleading which does not allege a detrimental change of position in reliance on the claimed promise falls short of stating a cause of action based on promissory estoppel.

*Id.* at 4, 508 A.2d 1364 (citing *Overlock v. Central Vermont Public Service Corp.*, 126 Vt. 549, 554, 237 A.2d 356 (1967)).

■ The Vermont Supreme Court appears to have limited its entertainment of promissory estoppel claims to employment cases in which the employee has detrimentally relied on statements made to him or her in an employee manual and has then been terminated despite such procedures. We find that this situation is not present here, and decline today to expand Vermont law to find a promise sufficient to support a promissory estoppel claim based on oral assurances.

■ Plaintiff's first claim is that he detrimentally relied on an oral promise by his supervisor that he could transfer to another department in the South Burlington store. We first find that this is not the type of promise that the Vermont Supreme Court has been willing to entertain as the basis of a promissory estoppel claim. Secondly, we find that this promise was not of a type that one would reasonably expect to induce reliance on the part of one to whom the promise was made. Plaintiff himself admits that Young's statement was made in such a manner that any response to his "promise" seemed inappropriate at the time.[8] Plaintiff's reliance on Mr. Young's offer was also not reasonable in light of Kmart's policy on transfers as found in the Employee Handbook, which Plaintiff acknowledges he has read. In order to transfer to another department, a Kmart employee must make his or her request in writing, and the request must be approved by the General Store Manager. (Employee Handbook at 12, Def.'s Mem. in Supp. of Mot. for Summ.J. Exhibit 7.) Plaintiff's actions on June 19, 1991, did not conform with this procedure.

■ Plaintiff also claims that he relied on promises of fairness in treatment by Kmart, and that he would continue to have a job with the company as long as he performed his job satisfactorily and there was work for him to do. He is unable, however, to point to one concrete statement that could be construed as such a promise. Further, Plaintiff makes no affirmative statement that he relied on any statements in the Employee Handbook to the effect that he would be treated fairly and continue in Kmart's employ as long as his work was adequate. This is because there are no such statements. In fact, there

---

8. In his deposition, Plaintiff asserts that Mr. Young offered to transfer him in the course of yelling at him for improperly performing his job as Sports/Auto Manager:

> He said, when he was yelling at me ... "Why can't I get it through your head, you are no good in that department." He says, "I can put you in another department if you want. I could put you over in Patio as Manager, or I can put you in Housewares." He was rambling off different departments of the store. He says, "When I say you are no good, I mean you are just no good in that department." (Pl.'s Dep. at 145.) Later in his testimony Plaintiff was asked why he hadn't accepted Mr. Young's offer when made. He responded, "he was yelling, he was not in a position to take answers to the questions." (*Id.* at 156.)

is not even a disciplinary policy comparable to that found in *Foote*. The disciplinary policy in Kmart's Employee Handbook states, "It is the function of the General Store Manager .... to administer discipline. Disciplinary action may take the form of written counseling, oral counseling or discharge."[9] (Employee Handbook at 13.) Further, the closing statement in the Handbook emphasizes, "Irrespective of any statement contained herein or in any other document or statement issued by K mart or any of its representatives, your employment is not guaranteed for any length of time and either the employee or the Company can terminate the relationship at will at any time with or without cause." *Id.* at 23. Plaintiff also mentions guidelines found in a store policy manual, but admits that he never read the manual. This manual has not been introduced into evidence.

Plaintiff's promissory estoppel claim is based on his belief that Kmart "never got rid of employees for no reason. They never disciplined any employees without reason." (Pl.'s Dep. at 77.) He is unable, however, to point to any policy of Kmart that supports his belief. Since the evidence, viewed most favorably to Plaintiff, shows no promise or policy of Kmart other than that it retained the right to terminate employees at any time and for any reason, Kmart's motion for summary judgment on Plaintiff's promissory estoppel claim is granted.

### D. *Defamation*

Plaintiff's fourth count charges that Kmart's statements to Federal that Plaintiff's probability of continued employment was "50–50 at this time," were false and defamatory.[10] We will first discuss the requirements in Vermont for an action in defamation, and then review the facts of the case to determine whether summary judgment is appropriate.

In Vermont, the general elements of a private action for defamation are set out in *Lent v. Huntoon,* 143 Vt. 539, 470 A.2d 1162 (1983). These elements are:

(1) A false and defamatory statement concerning another;

(2) some negligence, or greater fault, in publishing the statement;

(3) publication to at least one third person;

(4) lack of privilege in the publication;

(5) special damages, unless actionable per se; and

(6) some actual harm so as to warrant compensatory damages.

*Id.* at 546–547, 470 A.2d 1162. We will examine each of these elements in turn.

### 1. False and Defamatory Statement

A communication is defamatory "'if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Weisburgh v. Mahady,* 147 Vt. 70, 73, 511 A.2d 304 (1986) (quoting Restatement (Second) of Torts § 559 (1977)). For the purposes of this definition, the community may be a substantial respectable group, even though only a minority of the total community. *Fin v. Middlebury College,* 136 Vt. 543, 544, 394 A.2d 1152 (1978); *see also* Restatement (Second) of Torts § 559 comment e (1977).

Vermont does not recognize the concept of libel per quod. Rather, the Vermont Supreme Court has stated, "libel whether defamatory on the face of the writing alone or with the aid of extrinsic evidence, is actionable per se." *Lent v. Huntoon,* 143 Vt. at 548, 470 A.2d 1162. Where a writing is ambiguous, however, it is for a jury to determine whether it is defamatory or not, taking into consideration the circumstances in which it was made. *Id.*

9. Compare the Kmart statement with the preliminary statement to the Problem Solving Procedure at issue in *Foote:* "We make a constant and conscientious effort to see that all our employees are treated with consideration and fairness." *Foote,* 158 Vt. at 574 n. 3, 613 A.2d 1277.

10. Although Plaintiff's amended complaint does not differentiate between libel and slander, both are potentially present here. Kmart's response to the employment verification form would constitute libel if proven, whereas its comments over the phone would constitute slander. For our purposes, the only differences between the two are in what must be shown to recover damages.

We find that the writing at issue in this case is ambiguous and therefore deny Kmart's motion for summary judgment on this count. It is for the trier of fact to determine whether Kmart's answer of "50–50" in response to an inquiry regarding Plaintiff's likelihood of continued employment would indicate to a respectable community that everyone's chances of continued employment are 50–50,[11] or whether such a statement would instead indicate to this respectable community that Plaintiff performed his job poorly and therefore had as much likelihood of continuing his employment as he had of being terminated.

■ Summary judgment on this count is inappropriate for a second reason. Kmart asserts that its statement to Federal concerning Plaintiff's chances of continued employment was honest. (Answer ¶ 26.) Truth is an absolute defense to a defamation charge, *Lent,* 143 Vt. at 548, 470 A.2d 1162; *Lancour v. Herald & Globe Ass'n,* 111 Vt. 371, 379, 17 A.2d 253 (1941), and in this case it must be for the trier of fact to determine whether Kmart's 50–50 statement was made with a good faith belief in its truth.

### 2. Negligence in Publication

The United States Supreme Court in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) held that the individual States could define for themselves the appropriate standard of liability for a publisher of a defamatory falsehood injurious to a private person, so long as the states require at least negligence. *Gertz,* 418 U.S. at 347–48, 94 S.Ct. at 3010. This Court, in the absence of guidance from the Vermont Supreme Court on the issue of negligence in a defamation context, has chosen to apply the standard suggested by section 580B of the Restatement (Second) of Torts. *See Stone v. Banner Pub. Corp.,* 677 F.Supp. 242, 246–47 (D.Vt.1988).

■ Since the determination of whether Kmart's statement was defamatory must be left to the jury, the determination of whether Kmart was negligent in its publication of the statement must also be left to the jury. If the jury does determine that the statement was false and defamatory, it must then decide "whether the defendant acted as a reasonable, prudent person under the circumstances in publishing the defamatory communication on the basis of [its] check or lack of check as to its accuracy and as to its defamatory character...." Restatement (Second) of Torts § 580B comment h.

### 3. Publication to at Least One Third Person

Kmart's publication to Federal satisfies this condition.

### 4. Lack of Privilege in the Communication

■ This factor is among the most contentious between the parties to this litigation. Kmart claims that it enjoys a conditional privilege to make remarks about an employee's work record and that this privilege may only be overcome by a showing of malice or ill-will on the part of the publisher. (Supplemental Mem. in Supp. of Def.'s Mot. for Summ.J. at 7.) Plaintiff asserts that it is not clear that Kmart's statement to an entity outside the Kmart organization is covered by the privilege, and even if it is, there is a question of fact concerning whether Kmart's statement was made with malice. (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ.J. at 24.)

■ Vermont first recognized a conditional privilege for the protection of legitimate business interests in *Lent v. Huntoon,* 143 Vt. 539, 548–49, 470 A.2d 1162 (1983). While the Vermont Supreme Court recognized the conditional privilege, it affirmed the trial court's finding that in that case plaintiff had overcome the privilege by showing with clear and convincing proof that defendants made the statements with malice. Malice in Vermont will be inferred when a defendant had knowledge that its statement was false or acted with reckless disregard of the truth of its statement. *Id.* at 549, 470 A.2d 1162.

---

**11.** In responding to Lawrence Parante's phone call in which Parante asked Young if he really meant to answer 50–50 to the Federal's written inquiry, Young stated, "Well, sure, everybody is 50–50. You're 50–50, I'm 50–50, in this, you know, world." (sic) (Dep. of Lawrence Parante at 22.)

A court will find actual malice in spiteful or wanton conduct. *Id.*

No Vermont case examines conditional privileges in Vermont in detail, however, and those that discuss the issue even cursorily are of little assistance in resolving the issue before us, which is whether we should recognize a conditional privilege for communication regarding an employer to a party outside the corporation upon that party's request.[12] We choose to recognize a privilege in such a situation, subject to Vermont's rule that the privilege may be overcome by a showing of malice as defined in *Lent.*

It is important first to understand the rationale behind the provision of the conditional privilege. The Restatement (Second) of Torts states this rationale well:

Occasions making a publication conditionally privileged afford a protection based upon a public policy that recognizes that it is essential that true information be given whenever it is reasonably necessary for the protection of one's own interests, the interests of *third persons* or certain interests of the public. In order that the information may be freely given, it is necessary to afford protection against liability for misinformation given in an appropriate effort to protect or advance the interest in question.

Restatement (Second) of Torts ch. 25, topic 3, title A (scope note) (1977) (emphasis added); *see also* 50 Am.Jur.2d *Libel and Slander* § 195 (1970). Intra-corporate communications are conditionally privileged in order to protect a company's own interests. In the case before us, Kmart was attempting to protect the interests of a third party.

The Restatement also codifies the policy behind the conditional privilege afforded to protect third parties. Section 595 of the Second Restatement of Torts states:

(1) An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that

(a) there is information that affects a sufficiently important interest of *the recipient or a third person,* and

(b) the recipient is one to whom the publisher is under a legal duty to publish the defamatory matter *or is a person to whom its publication is otherwise within the generally accepted standards of decent conduct.*

(2) In determining whether a publication is within generally accepted standards of decent conduct it is an important factor that

(a) *the publication is made in response to a request rather than volunteered by the publisher.* . . .

(emphasis added). The Restatement clearly addresses the situation presented to us and we believe it is the correct course to follow. Federal requested Kmart provide it with information regarding Plaintiff's employment status. The interest involved in providing such a communication is not Kmart's, it is instead Federal's interest in providing loans to people in good financial standing. We believe it is very appropriate in such a situation to protect communications such as that Kmart provided *as long as such communications are made without malice.*

We have already stated Vermont's test for determining if there is malice in an allegedly defamatory communication. Under either of the two definitions, there exists a question of fact that is properly put to a jury for determination. There is a question of fact as to whether in fact this statement was false, and if false, if Young on behalf of Kmart knew it to be false or acted in reckless disregard of its falsity. Plaintiff also alleges that Young acted spitefully to prevent Plaintiff from obtaining a mortgage for the mobile home he hoped to purchase. This is also a question of fact for the jury. Plaintiff may overcome Kmart's qualified privilege upon a jury finding of malice based on a standard of clear and convincing proof.

■ A second issue regarding privilege is that of consent. Kmart claims that its state-

---

12. Vermont has created a statutory absolute privilege for communications by an employer or employee to the Commissioner of the Department of Employment and Training regarding applications for unemployment compensation benefits. 21

V.S.A. § 1314(g) (1987). While this provision does not govern the situation before us, it does show that Vermont recognizes a confidential communications privilege to parties outside the intra-corporate context.

ments to Federal were absolutely privileged because Plaintiff signed a waiver provided by Federal, which authorized Kmart to provide Federal with information regarding Plaintiff's employment status. Plaintiff counters with an assertion that the doctrine of consent has never been adopted in Vermont, and that even if it is, he consented to Kmart's publication of a truthful statement regarding him, not a defamatory statement.

In the absence of guidance from the Vermont Supreme Court, we find the treatment of this issue by the Maryland Supreme Court helpful in guiding our own determination. In *McDermott v. Hughley*, 317 Md. 12, 561 A.2d 1038 (1989), plaintiff claimed defendant psychologist defamed him in a diagnosis and recommendation report by accusing him of being a malingerer and manufacturing false symptoms of phobia. In earlier meetings, the defendant had indicated to plaintiff that he believed his phobia was real. Plaintiff had subsequently signed a release authorizing defendant to disclose his findings concerning plaintiff's condition.

The Maryland court determined that whether consent in this case should give the defendant an absolute privilege for his statements was a jury question. The court posed two questions for the consideration of the jury. First, should the plaintiff reasonably have been aware that defendant's report would have been defamatory? Second, if plaintiff had been aware that plaintiff's report might be defamatory, would he have signed the consent form? 561 A.2d at 1046.

We find that the approach of the Maryland court fits well with the situation before us. Plaintiff had reason to believe that a number of people with whom he worked did not think well of him. On the other hand, he might not have known to whom the responsibility of completing the waiver form would fall. These questions are appropriately considered by the jury.

## 5. & 6. Special Damages, Unless Actionable Per Se, Actual Harm

In order to prevail in a libel action, a plaintiff must generally show actual harm.[13] Actual harm may consist of impairment of reputation in the community, personal humiliation, and mental anguish and suffering. *Lent*, 143 Vt. at 549, 470 A.2d 1162 (quoting *Gertz*, 418 U.S. at 350, 94 S.Ct. at 3011). This is typically a rather easy standard to meet and Plaintiff has made allegations sufficient to show actual harm on his libel claim.

One claiming damages in an action for slander, however, must demonstrate special damages unless he or she claims slander of a type considered actionable per se. The statement Plaintiff asserts as defamatory in this matter is not of such a type.[14] Special damages are those of a pecuniary nature. Examples of such damages include loss of business or customers, loss of employment, or loss of contracts. Plaintiff alleges Federal refused to grant him a mortgage due to Kmart's defamatory statement, and therefore satisfies the requirement of proof of special damages.

Defendant's motion for summary judgment on Plaintiff's defamation claim is denied. The issues concerning this claim that remain for the jury include: (1) whether Kmart's statement that Plaintiff's chances of continued employment were 50–50 was true; (2) if false, whether, given the circumstances in which the statements were made, they were defamatory; (3) if false, whether Kmart acted negligently in making the statements; (4) if false, whether Kmart acted with malice and therefore is not entitled to a conditional privilege; (5) whether Plaintiff consented to the statements.

### E. *Interference with Prospective Contractual Relations*

Plaintiff's fifth count alleges that Kmart employees dishonestly, untruthfully,

---

13. Note that the Vermont Supreme Court has pointed out that libel actions are always actionable per se, with special damages presumed. *Lent*, 143 Vt. at 545–46, 470 A.2d 1162.

14. Vermont recognizes three types of spoken statements as slander per se: (1) imputation of a crime; (2) statements injurious to one's trade, business, or occupation, or (3) charges of having a "loathsome disease." *Lent*, 143 Vt. at 546, 470 A.2d 1162.

and in bad faith misrepresented to Federal his chances of continued employment at Kmart with the intent that Federal deny Plaintiff's mortgage loan. His claim is for negligent or intentional interference with a contractual relationship.

The Vermont Supreme Court has not ruled on whether negligent interference with contractual relations is a viable cause of action, noting instead that most courts focus on intent as the basis of liability for tortious interference. *See Trepanier v. Getting Organized, Inc.,* 155 Vt. 259, 268 n. 4, 583 A.2d 583 (1990). We decline today to tread in this area where the Vermont Supreme Court has not and therefore concentrate on the requirements for stating a claim for intentional interference with contractual relations.

The tort of intentional interference with contractual relations was recognized by the Vermont Supreme Court in *Mitchell v. Aldrich,* 122 Vt. 19, 22, 163 A.2d 833 (1960). In *Mitchell,* the Court emphasized that the tort is not restricted to interference with existing contracts, but is also available as a basis for recovering for interference with prospective relationships from which one maintains a reasonable expectation of profit. 122 Vt. at 23, 163 A.2d 833; *see also Vermont National Bank v. Dowrick,* 144 Vt. 504, 510, 481 A.2d 396 (1984). Section 766B of the Restatement (Second) of Torts contains a useful formulation of the tort of intentional interference with a prospective contractual relation:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

While Kmart's statement that Plaintiff's chances of continued employment were 50–50 was the reason that Plaintiff's home loan application was denied, (*see* Parante Deposition at 20–21) it remains to be determined whether the statement was improperly and intentionally made.

Because we find there is an issue of fact both as to whether Kmart's statement was truthful,[15] and as to whether Kmart made the statement in good faith, we deny Kmart's motion for summary judgment on the intentional interference with contractual relations claim. Summary judgment is also inappropriate on this count because an issue of fact exists as to Kmart's intent in making the statement to Federal.

## CONCLUSION

For the foregoing reasons, Kmart's motion for summary judgment is GRANTED with respect to counts I (wrongful discharge, intentional infliction of emotional distress), II (breach of contract), and III (promissory estoppel) of Plaintiff's complaint, and DENIED with respect to counts IV (defamation) and V (interference with contractual relations) of Plaintiff's complaint. Plaintiff's motion to strike and Kmart's motion to strike and for Rule 11 sanctions are also DENIED.

SO ORDERED.

---

**15.** The truthfulness of the Kmart's statement to Federal is also an issue under Plaintiff's defamation claim. *See* discussion at p. 779, *supra.*